Steven N. Williams (State Bar No. 175489)
Kai'Ree K. Howard (State Bar No. 351730)
**STEVEN WILLIAMS LAW, P.C.**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: 415-697-1509
Fax : 415-230-5310
Email: swilliams@stevenwilliamslaw.com
Email: khoward@stevenwilliamslaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| I.H.M., A MINOR THROUGH HER NEXT OF FRIEND BILL SORENSEN,<br><br>      Plaintiff,<br>vs.<br><br>SOPHIA WEBB, an individual,<br><br>MUNISHA VOHRA, an individual,<br><br>CONTRA COSTA COUNTY, a public entity,<br><br>PAMELA GAGLIANI, an individual, and<br><br>DOES 1 to 50, inclusive,<br><br>     Defendants. | Case No.: 3:22-cv-06026- VC (TSH)<br><br>**SECOND AMENDED COMPLAINT** |

COMES NOW, Plaintiff I.H.M. ("Plaintiff"), as and for her Complaint in this matter, setting forth the below claims related to acts and omissions by Defendants in her dependency case.

## I.  NATURE OF THE ACTION

1.  This is an action alleging violations of 42 U.S.C § 1983, a *Monell* claim, Negligence, False Representations to a State Court, Negligent Supervision and Legal Malpractice based upon the willful and intentional acts and omissions of Defendant Contra Costa County ("County") and Defendants Sophia Webb ("Webb"), Munisha Vohra ("Vohra") and Pamela Gagliani ("Gagliani").

2.      Defendants have made the life of a marginalized young African American woman into what can only be described as a living nightmare. Webb, Vohra, Gagliani and the County (collectively "Defendants") removed a young girl from the loving home of her family and legal guardian, and intentionally placed her into the foster care system, where she endured unspeakable acts of physical, sexual and emotional abuse. Plaintiff has been beaten, restrained, sexually assaulted, placed in solitary isolation, and has even had food withheld from her – these are a few of many examples of the deplorable harm Plaintiff has endured at the hands of Defendants.

3.      As stated by an ███████ in Plaintiff's case, ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Defendants not only disrupted the bond between Plaintiff and her great grandmother – they ensured that her lifeline was completely and irreparably severed, as will be described in greater detail below.

4.      By way of this action, Plaintiff seeks to recover damages, equitable relief, and declaratory and injunctive relief for the acts and omissions of Defendants.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 as Plaintiff asserts claims based on violations of 42 U.S.C. § 1983.

6.      The Court has supplementary jurisdiction over any cause of action set forth herein which does not arise under federal law.

7.      The acts, omissions, and other wrongdoing alleged herein occurred in Contra Costa County and the Defendants are all believed to reside in or otherwise are located in Contra Costa County, making venue appropriate in this Court.

## III.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      Plaintiff timely submitted a notice of claims to Contra Costa County for the causes of action against all Defendants, other than Defendant Gagliani.

9.      The notice set forth claims for (1) fraudulent concealment, misrepresentation and judicial deception; (2) violation of Plaintiff's rights to due process; (3) kidnapping and false

imprisonment; (4) failure by social workers to carry out their duties owed to Plaintiff under the California Welfare and Institutions Code; (4) discrimination on the bases of race and disability; and (5) negligent supervision.

10.    The notice was received by Contra Costa County on March 9, 2022.

11.    On April 12, 2022, the Clerk of the Board of Supervisors of Contra Costa County granted the application, and a notice was served by mail to Plaintiff that same day.

IV.    **PARTIES**

12.    Plaintiff I.H.M. ("Plaintiff") was a minor at the time of the events described herein, and maintains her anonymity in this Complaint, given the nature of the claims and allegations. At all times relevant to this Complaint, Plaintiff was a resident of Contra Costa County and was the subject of a dependency case. Currently, Plaintiff is the age of majority.

13.    Defendant Contra Costa County ("County") is a local government entity of the State of California. Contra Costa County Department of Children and Family Services ("DCFS") is a subdivision, entity or administrative unit of Defendant Contra Costa County.

14.    Defendant Sophia Webb ("Webb") was, at all times relevant to this Complaint, a case social worker and/or supervisor with DCFS and worked on the dependency case of Plaintiff. Defendant Webb is a resident of the State of California.

15.    Defendant Munisha Vohra ("Vohra") was, at all times relevant to this Complaint, a case social worker and/or supervisor with DCFS and worked on the dependency case of I.H.M. Defendant Vohra is a resident of the State of California.

16.    The DCFS individual employee defendants named above shall be referred to herein as "DCFS Defendants."

17.    Defendant Pamela Gagliani ("Gagliani") was, at all times relevant to this Complaint, an attorney assigned to act as counsel for Plaintiff in her dependency case. Defendant Gagliani is a resident of the State of California.

18.    Each of the Defendants, except for Gagliani, were at all relevant times acting under color of law.

19.     Each of the Defendants, in conducting the acts and omissions alleged herein, were acting in concert with and as an agent of the other Defendants.

## V.     **GENERAL ALLEGATIONS**

### A. **General Background**

20.     Plaintiff was born in ▓▓. Plaintiff was a minor during all relevant times that the events set forth herein took place.

21.     Plaintiff's parents ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ years old.

22.     Subsequent to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ is the matron of a larger African American family with long time roots in the Bay Area.

23.     ▓▓▓▓ has, and at all relevant times herein, had a well-kept, large five-bedroom home in ▓▓▓▓▓▓▓▓▓▓ has additionally fostered a number of children from DCFS herself.

24.     In late 2014, Vohra intentionally orchestrated the forced removal of Plaintiff from her family home she resided in with her legal guardian, ▓▓▓▓ Vohra petitioned the state court to remove ▓▓▓ legal guardianship status as to Plaintiff, and to place Plaintiff in the custody of DCFS. As will be described in further detail below, Vohra was ultimately successful in this endeavor.

25.     It is common practice of DCFS that every dependency case is passed from one team of social workers and supervisors, to another team of social workers and supervisors. Further, a case worker might leave a case for various reasons, whereby another social worker would then step into the case. Such transitions, however, have been known to take place when DCSF attempts to surreptitiously "break the chain of liability" by constantly replacing social workers, shielding wrongdoing.

26.     The original social worker assigned to Plaintiff's case was an individual named ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ rarely checked on the Plaintiff or reported on the status of

Plaintiff's general well-being. ▮▮▮▮▮ supervisor at the time, ▮▮▮▮▮▮▮▮▮▮▮▮▮ similarly failed to follow up with Plaintiff or inquire as to ▮▮▮▮▮ lack of status updates of Plaintiff. Notably, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

27. ▮▮▮▮▮ was soon replaced with an individual by the name of ▮▮▮▮▮ ▮▮▮▮▮, who was replaced by Vohra, and then Webb.

28. Before the wrongdoing of Defendants described herein took place, Plaintiff had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. She did not have deep-seated or profound behavioral or psychological issues.

29. In ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. During this time, Vohra was the social worker overseeing Plaintiff's case.

30. The ▮▮▮▮▮▮▮▮▮ had serious issues with young students suffering from physical and mental abuse, as well as sexual predation from other delinquent students who were not being properly supervised. There were numerous instances where Plaintiff had been left isolated by the school, restrained, and experienced such high levels of stress that she ▮▮▮ ▮▮▮▮▮▮▮▮▮▮. Plaintiff's ▮▮▮▮▮ due to the stress at ▮▮▮▮▮▮ ▮▮▮ became so apparent, she started to ▮▮▮▮▮▮▮▮▮▮.

31. Plaintiff's legal guardian, ▮▮▮, raised numerous concerns with the school about what was happening to her daughter there. Due to the serious issues at ▮▮▮▮▮▮ ▮▮▮▮▮ and Plaintiff's loved ones believed it was best that she leave ▮▮▮▮▮ ▮▮▮.

32. In ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮. Plaintiff was so anxious to ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ her first day of class.

33.   Plaintiff flourished for a short time while at ██████████████████

was visibly happy. Plaintiff stopped ████████████████████████████████

████████████ an award was set up in recognition of the ████████████ with her.

34.   Upon information and belief, Vohra and others at DCFS had animus towards

████████ and perhaps a desire to cover up the negligent care of Plaintiff on the part of Defendants

themselves. Vohra and others at DCFS made false and incorrect accusations against ██████ and

Plaintiff, and omitted important information in their communications with others at DCFS, law

enforcement and judicial authorities.

35.   On ██████████████████████████████████████████████

██████████████████████████████, attended ████████████████,

██████████████████████████████. The team feedback was overwhelmingly

positive – ██████████████████████████ was a great fit for Plaintiff and that ██████ was

doing a wonderful job following ████████████████.

36.   During the ████████, Vohra was present and was ████████████████

████████████. Vohra suddenly █████████████████████████████████████

████████████████████████████████. Plaintiff's Counselor, ██████████

████████████████████████████████████████████████████████████

██████████████████████████████. Notably, Plaintiff's

████████████████████████████████████████████████████████████

████████████████████████████████████████████████. Using ████████

as a way to help focus is a common sign of sensory and attention

challenges (Plaintiff has ████████.

37.   In response to Vohra's ████████████████████, Counselor explained ██

████████████████████████████████████████████████████████████

████████████████████████████████████. Dissatisfied with

████████████████ Vohra began ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████



relayed to Vohra.

38. ████████████████████████████

████████████, and noted the above incident was similar to what ██████

████████████████████████████████

████████████████████████████████

████████████████████████████

████████ ██████████████████████

████████████████████

39. ██████████████████████████ Plaintiff had been removed from ██████ home. ██████ called ██████ to understand what had happened. ██████ explained that Vohra had ██████████████████████████

████████████████████████████████

████████████ noted ████████ was "████████████

40. In order to ensure the removal of Plaintiff from her family home, Vohra and others at DCFS raised other complaints of little or no merit: ████████████████

████████████████████████████████████

████████████████

41. DCFS brought up other irrelevant or meaningless claims, such as ████████

████████████████████████████████

████████████. After a ████████████████████ DCFS accused a resident of ██████ and Plaintiff's home of being involved in ████████ (which was not true).

42. Committed to removing Plaintiff from her family's home, Vohra conducted a ████████████████████████████ Vohra found a ████████████

████████████████████████████████.

Defendants presented no further evidence beyond this allegation.

43.     Upon information and belief, Vohra decided to strike while the iron was hot, and promised Plaintiff that she could go home if she ▮▮▮▮▮ home. Wanting to go home, Plaintiff ▮▮▮▮▮ gave it to Vohra. Plaintiff has explicitly stated, on numerous counts, that the statement she ▮▮▮ was false and was only ▮▮▮▮ a means of trying to go home, as promised by Vohra.

44.     In or around the summer of ▮▮▮, Plaintiff's case worker changed to Webb. During this time, Webb's supervisor, ▮▮▮▮▮▮ sent a ▮▮▮▮▮ been lost. Upon information and belief, Webb and Castillo made no attempts to find ▮▮▮▮▮

45.     Webb attended ▮▮▮▮▮ which were soon cancelled due to Plaintiff's foster mother failure to attend. Webb knew or should have noticed the uncooperative behavior of Plaintiff's foster mother during this time. Unfortunately, Webb limited her visits with Plaintiff to a mere ▮▮▮▮▮.

46.     Webb never inquired as to what Plaintiff was enduring at the facilities she was in and out of and showed a complete disregard for Plaintiff's general well-being.

47.     On or about ▮▮▮▮, it was discovered that Plaintiff had been ▮▮▮▮▮ in a foster home, which ▮▮▮▮. Plaintiff was unable to show ▮▮▮▮▮ because her foster parents had intentionally destroyed the ▮▮▮▮▮ with a rock.

48.     Plaintiff requested to both Vohra and Webb to visit with ▮▮▮ as was promised to her, to which both case workers ignored such requests.

49.     On or about ▮▮▮▮ at the urging of Plaintiff's social workers, Plaintiff's foster parent took Plaintiff to a ▮▮▮▮▮▮▮▮. Plaintiff's ▮▮▮▮▮ disagreed that Plaintiff needed a ▮▮▮▮▮

50.     Dissatisfied with ███████████ opinion that Plaintiff did not need ███████ ███████ Webb made efforts to replace ████████ with someone who would simply agree with her demands.

51.     On or about █████ ████████ Plaintiff was given a ███████████████. Plaintiff was subsequently prescribed ████████████████████████ requested by case worker Webb. Plaintiff had ███████████████████████ and her behavior took a turn for the worse. ███████████████████████

52.     On or about ████████████████████ ███████████ Plaintiff's ██████ emphasized the need for Plaintiff to have consistency ███████████████████████ she was experiencing while getting placed from one foster home to another.

53.     On or about ███████████████████████ reported to Webb that Plaintiff had informed her of being deprived of food in her foster home. Webb willfully chose to ignore ███████████ which resulted in Plaintiff suffering continued abuse and neglect.

54.     Soon thereafter, Webb advocated for the termination of ████'s legal guardianship and family reunification services. Based on the false allegations and reports by Defendants, the court suspended visits with █████, removed her educational rights to Plaintiff, and denied her rights to participate in ████████████████. Additionally, the court denied any future relative placements for Plaintiff without court order.

55.     On or about ████████████ Plaintiff (whom was ███████ old at the time) was sent to a Behavioral Health Center in the State of Texas, ███████████ DCFS did not inform █████, any relatives, or professionals working with Plaintiff of her placement at a Behavioral Health Center in Texas.

56.     ████████ was notorious for being an unsafe mental health institution, where physical abuse and neglect occurred. While at ████████, Plaintiff was repeatedly abused, did not meet with a therapist or psychiatrist, and deteriorated rapidly.

### B.  Defendant Gagliani's Advocacy Against Plaintiff's Interests

57.     Defendant Gagliani had been Plaintiff's appointed minor counsel since Plaintiff was only two years old.

58.     Throughout her role as counsel to Plaintiff, Gagliani zealously took the lead in the renewed litigation to advocate for the removal of Plaintiff from          home (contrary to what was in the best interest of then minor Plaintiff).

59.     Gagliani did not speak to Plaintiff to ascertain the facts, prior to her advocacy for the removal of Plaintiff from          home. Gagliani relied on DCFS's reports and accusations, without any questions or inquiry as to the veracity of the accusations and was ultimately successful in advocating for the removal of Plaintiff from          home.

60.     In          Defendant Gagliani blindly sided with DCFS social worker Munisha Vohra without any questions and without her own investigation. Galigani never talked to Plaintiff to find out her wishes to verify the allegations made by Vohra.

61.     During the contested hearing, Gagliani took charge in most of the litigation to advocate that Plaintiff be taken from her great grandmother          . Gagliana never spoke to Plaintiff about this.

62.     Gagliani appears to have a history of colluding with DCFS. In another dependency case, Gagliani conspired with disgraced former judge John Laettner to deceive and coerce a client into submitting to jurisdiction by telling her client that if the client contested the detention and jurisdiction, DCFS would bypass her client and she would never see her two year old son again. A witness saw Gagliani hook pinkies with the county counsel who prosecuted the case.

63.     Throughout the whole dependency case, Gagliani seldom if ever talked to Plaintiff to ascertain the truth of the allegations Vohra made against Plaintiff's legal guardian and relatives.

64.     Upon information and belief, Gagliani has been practicing as a dependent attorney in Contra Costa County for at least 15 years.

65.     Gagliani never talked to Plaintiff while she was placed in the homes and schools
that she was placed in to check on Plaintiff's wishes or welfare.

66.     Gagliani never inquired of Plaintiff's well-being.

67.     Gagliani never spoke to Plaintiff when she was placed in the out-of-state mental
institution ████████ to check on Plaintiff's wishes or welfare.

68.     Upon information and believe, Gagliani conspired with DCFS to cover up abuses
of Plaintiff by shipping Plaintiff to an out-of-state mental institution. Galgiani never checked
with Plaintiff about her welfare or wishes.

69.     After Plaintiff returned to California in 2018, Gagliani never spoke with her to
find out what happened at ████████;

70.     Galgiani knew and should have known of many incidents that Plaintiff had been
abused and exploited, but she allowed Plaintiff to go without psychotherapy which would have
relayed to the provider things that would have caused the whistle to be blown on DCFS.

71.     Throughout the dependency case, Gagliani was looking out for the interests of
DCFS and did not care about Plaintiff's welfare and interests.

72.     Gagliani represented to the state court that Plaintiff was doing incredibly well
after being removed from her family's home, when in fact, Plaintiff was doing poorly, which
was made evident through her behavior, such as pulling her hair out in chunks.

73.     In 2015, relying on information presented to the court in the contested hearings by
Vohra and Gagliani, the state court issued an order removing ████████'s legal guardianship. The
court allowed for ████████ and other relatives to continue supervised visits only.

74.     Subsequent to the removal of ████████'s legal guardianship, Plaintiff was then
placed in a series of group homes.

75.     Around the time Plaintiff was placed in group homes, Webb became the case
social worker assigned to Plaintiff's case.

76.     Carter tried to continue to monitor Plaintiff's well-being during this time. DCFS
and Webb cut off all communication between Plaintiff, ████████ and her other relatives.

77.     DCFS and Webb isolated Plaintiff from almost everyone in her life, except for a

tutor.

**C.  Plaintiff's Return to California**

78.     In the latter part of 2018, Plaintiff returned to the State of California. By that time,

Plaintiff had suffered such severe trauma at the hands of DCFS, it became difficult for her to get

adopted.

79.     Notably, DCFS could not find permanent placement for Plaintiff within three

years. Under the California Welfare and Institutions Code, Plaintiff should have been returned

to her relatives.

80.     Plaintiff was eventually placed in a group home in or near ███████████

███ did not find out that Plaintiff was back in the State of California until she received a call

from a hospital in 2020, advising her that Plaintiff was hospitalized with Covid-19.

81.     As a result of the above-described neglect, abuse, and trauma, Plaintiff's

dependency case was dismissed and Plaintiff ended up in juvenile delinquent court.

82.     The lasting effects of the severe abuse Plaintiff endured will be a lifelong battle,

all caused by Defendants herein. Plaintiff will never be made whole, but this action is a step in

the right direction of rectifying the deplorable wrongs committed by Defendants.

**CLAIMS**

**FIRST CLAIM**

**NEGLIGENCE**

**AGAINST ALL DEFENDANTS**

83.     Plaintiff realleges and incorporates all paragraphs and allegations set forth above

as if set forth in full.

84.     Defendants owed duties to Plaintiff.

85.     Defendants breached their duties to Plaintiff.

86.     Plaintiff was harmed as result of the Defendants' breach of their duties.

87.     Plaintiff has suffered damages as a result.

**SECOND CLAIM**

**FALSE REPRESENTATIONS TO STATE COURT**

**AGAINST WEBB, VOHRA AND DOE DEFENDANTS**

88.     Plaintiff realleges and reincorporates all paragraphs and allegations in this amended complaint in each of the claims as if set forth in full.

89.     Defendants made misrepresentations to the state court, and made omitted material facts which should have been presented to the state court. This was done in order to further the agenda of taking Plaintiff away from her family.

90.     The misrepresentations and omissions were a substantial factor in causing the state court to issue an order taking Plaintiff form her family.

91.     Plaintiff was damaged as a result.

92.     Plaintiff is informed and believes that the defendants named in this claim acted with malice and with the specific intent of causing injury, or otherwise acted with a willful, knowing and conscious disregard for Plaintiff's rights. Therefore, Plaintiff is entitled to an award of punitive damages to punish and deter these Defendants, and others, from similar conduct in the future.

**Third claim**

**NEGLIGENT SUPERVISION**

**AGAINST ALL DEFENDANTS**

93.     Plaintiff realleges and incorporates all paragraphs and allegations in this Complaint as if each of the claims were fully set forth herein.

94.     The decisions made as alleged herein were made by a team of supervisors, mangers and sometimes the director of DCFS.

95.     These Defendants ordered and ratified the banishment of Plaintiff to an out-of-state mental institution where she was harmed both through removal of contact with her family and through abuse that she suffered at that institution.

96.     Defendants owed duties to Plaintiff to take appropriate care of her while she was in Defendants' custody, and Defendants owed duties to insure that she was properly supervised.

97.     Defendants breached these duties.

98.     Plaintiff was harmed by these breaches.

99.     Alternatively, Defendants knew that the banishment was without cause and a violation of Plaintiff's' constitutional rights yet they condoned this act.

100.    As such, these defendants are liable for damages.

### FOURTH CLAIM

### LEGAL MALPRACTICE

### AGAINST DEFENDANT GAGLIANI

101.    Plaintiff realleges and incorporates all paragraphs and allegations in this Complaint as if each of the claims was fully set forth herein.

102.    Defendant Gagliani, as the appointed counsel for Plaintiff, owed her a duty of loyalty and diligence.

103.    Defendant Gagliani breached this duty of care as set forth above.

104.    Plaintiff was harmed as a result of these breaches.

105.    Because of Defendant Gagliani's negligence and breaches of duty, Plaintiff was wrongfully separated from her relatives, placed in dangerous and unsafe schools and homes, and languished for years in a mental institution for no good reason.  Plaintiff suffered severe damage as a result and seeks recovery for those damages in this action.

### FIFTH CLAIM

### VIOLATIONS OF 42 U.S.C. § 1983

### AGAINST ALL DEFENDANTS

106.    Plaintiff realleges and incorporates all paragraphs and allegations in this Complaint as if each of the claims was fully set forth herein

107.    By taking Plaintiff into their custody, DCFS had created a special relationship between them and Plaintiff, a minor who could not take care of herself.

108.    Defendants failed to protect Plaintiff by their failures to make regular diligent inspection and inquiry for the welfare and safety of Plaintiff while she was placed in group homes and ████████

109.    By putting Plaintiff in an unsafe environment, Defendants assumed responsibility to her. They exposed Plaintiff to unnecessary danger. Incarceration in an out of state mental institution is never an appropriate treatment for a minor with hyperactive disorder and who has suffered traumas from abuses and neglect in a foster home.

110.    During Plaintiff's incarceration at ████, Plaintiff informed Defendant Webb of the abuses but she failed to do anything about it.

111.    Defendants knew that Plaintiff suffered separation traumas, neglects and abuses while under their custody, but they failed to provide Plaintiff with any timely or appropriate mental health treatment.

112.    Plaintiff was a minor placed in the hands of Defendants. She was totally dependent on Defendants for timely and appropriate psychological treatments for the traumas and abuses she suffered while in their custody.

113.    As a result, Plaintiff has suffered life-long psychological traumas.

114.    Under the 14th Amendment and legal precedents, Plaintiff had a clearly established right not to be subject to violation of due process through judicial deception and concealment of evidence.

115.    Social workers under state law are supposed to be neutral and impartial parties to the dependency case. They are supposed to provide the state court with fair, full and complete information in the case so the judge can make proper and valid decisions to protect the interests and welfare of the dependent child.

116.    Defendants should have known that they could not violate these clearly established rights.

117.    Vohra misled the state court into believing that there was a gang member and a child molester in ████s home to obtain an order from the state court to take Plaintiff from her family. These allegations were not based in fact.

118.    Defendants knew that Plaintiff was placed homes where she was neglected and abused but they kept this fact from the state court to cover up their neglect and failure to protect, to continue keeping Plaintiff from her family (where she would have been safer) and to keep

Plaintiff imprisoned in an out of state mental institution so Plaintiff could not disclose the abuses and neglect she suffered under their custody.

119.     By sending Plaintiff to a prison-like environment of a mental institution where she suffered physical and mental abuses and solitary environment while receiving no appropriate treatments, Defendants have violated Plaintiff's constitutional rights under the Fourth Amendment for unreasonable seizure and her right under the Eight Amendment against cruel and unusual punishment.

120.   Plaintiff and Plaintiff's family were singled out and profiled by Defendants by stereotyping Black people as gang members and child molesters.

121.     DCFS and the Doe Defendants failed to provide Plaintiff with an opportunity to return to her family once they failed to find permanent placement (through an adoption) for more than three years.

122.     Plaintiff seeks all available damages for this claim.

**SIXTH CLAIM**

**MONELL CLAIMS**

**AGAINST DEFENDANT CONTRA COSTA COUNTY**

123.   Plaintiff realleges and incorporates all paragraphs and allegations in this amended complaint in each of the claims as if set forth in full.

124.   The County had a duty to implement and follow policies, customs, and/or practices which conform to and provide the protections guaranteed under the United States Constitution and federal law. The County had a duty to use reasonable care to train, supervise, and control its social workers, so as not to trespass on constitutional and statutory rights of dependent children such as Plaintiff.

125.     In the early 2000's, Contra Costa DCFS was sued for placing boys in the home of Bertinuson, a single male pedophile with a particular preference for young blond boys. DCFS social worker Janet Bisbing grew suspicious of Bertinuson but did not report her suspicion to the police.

126.   Another social worker, Jan Kader, reported false in her logs that she regular met with Bertinuson and the foster children and that the children were doing well and happy when in fact she only met Bertinuson at restaurants and shopping centers instead of his home. Only eight visits could be accounted for over the years.

127.   In this case, another social worker also told Debbie Harless that her son was doing well with Bertinuson and did not want to come home. Later her son told her that it was Bertinuson, not he, who told the social worker that he did not want to come home.

128.   The Bertinuson's crimes against the children only came to light only after a child reported the sexual molestations to the police.

129.   More than a decade later, the same problems persist.

130.   In 2014, Contra Costa DCFS placed FK's young daughter A.M.K. with a foster parent named Mallet. Mallet was a pedophile and DCFS knew or should have known that. The case was then dismissed for lack of evidence. FK only found that out when the sheriff officers came to his home to investigate. When FK called DCFS to complain, he was told by a supervisor that he should be glad he got his daughter back and DCFS could do nothing to help her because Mallett was dead. The daughter's mental health issues became worse and worse. She was arrested and 5150ed for more than 50 times. The County then tried to prosecute her as a juvenile delinquent. The judge ordered the case dismissed and the County to provide mental health treatment for the child.

131.   In 2019, a father and son duo, Simon Mendoza Chavez and Simon Magana Chavez were arrested on multiple charges of sexual abuse of foster children put in their care by Contra Costa DCFS from 2011 to 2017. They were charged 78 offenses multiple charges of sexual abuses of foster children put in their care by Contra Costa DCFS from 2011 to 2017. The son admitted to DCFS to making out with one of the victims in 2013 but continued to receive foster children for the next six years.

132.   In the same article, another boy taken by DCFS in 2017 reported that he witnessed in the group homes child prostitution and drug use. He also reported that social workers pressured him to tell lies against his mother.

133.    In 2017, DCFS filed a petition to take LS's young teenage daughter on allegations that she allowed the child to be overmedicated with psychotropic medications without good cause and that she was starving her child causing failure to thrive. DCFS then placed the child in a group home and an out of county foster home and informed the dependency court that the child was doing well.

134.    In December 2017, without court authorization, Defendant Webb had to take the child out of the foster home and turned her over to an uncle in Sacramento. The child was severely malnourished, near catatonic and suffered from PTSD. The uncle found that the foster mother gave the child high heels and inappropriate suggestive clothes. Webb only reported to the court that she had to turn the child to the uncle because the foster parents no longer wanted the placement and that she did not want to place the child in a group home with boys.

135.   The previous social worker in the case falsely reported to the court that the child was thriving while under DCFS custody.

136.    Even when the child was still covered by her mother's health insurance plan, the social worker did not have her seen by a nutritionist or evaluated by a psychologist in violation of court orders for months to conceal the fact that she was not doing well mentally and physically and actually failed to thrive with significant weight loss.

137.    After Sophia Webb turned the child over to an uncle from another county without court authorization, DCFS cut off the mother's visitation and education rights and so that the mother could not learn the true condition of her daughter.

138.    In 2018, DCFS seized D.R. a newborn from her maternal grandmother. D.R.'s mother had entrusted D.R. in the care of the grandmother as she did with another daughter because she was homeless. Four months later, the child died of suffocation in the foster home when the foster mother left her alone for hours, swaddled in a DockATot, a dangerous baby crib. The foster mother reported that she found the child facedown and non-responsive. About ten days after the incident, the case social worker claiming to be the next of kin, obtained the body from the coroner's office for cremation. The coroner reported five months later that the death was natural even though he never visited the scene of death and never mentioned the

circumstances of death in his report and unexplained injuries such as internal bleedings and contusions at the back of the head. DCFS social workers never conducted any investigation and assured the foster mother that in their hearts, they already knew that she was not at fault. DCFS did not provide the court with the police report or the full coroner's report.

139.    In a case in the California Third District Court of Appeal, In re B.D. (opinion filed on May 24, 2019), Contra Costa DCFS social workers concealed from the dependency court that they put a foster child into the foster home where the father had a criminal record, abused his three sons who in turn abused other children, and whose parental rights had been terminated. The case social worker always reported the child as "thriving" until the state judge got a rude awakening when one month after ordering the child to be adopted, the County had to file a proceeding to terminate the adopting father's parental rights. Contra Costa social workers regularly reports that foster children are thriving even when the social workers know that the opposite is true.

140.    Kathy Gallagher, a past director of Contra Costa DCFS admitted to a reporter of a local newspaper that "We don't consider it relevant what's going on in their personal lives" ,when asked about a social worker Susan Porter who was exposed in a civil lawsuit with a history of domestic violence assault and of setting up her husband for a DUI arrest to gain advantage in a custody dispute.

141.    No social workers from Contra Costa have ever been disciplined for judicial deceptions. The County seldom admitted that their social workers had committed perjury. DCFS has made no attempt has been made to rectify the damages to parents and children. On the contrary, Contra Costa defends them against civil lawsuits for judicial deceptions.

142.   When parents complained of their children being abused or neglected in the custody of DCFS, DCFS social workers with full cooperation from county counsel engage in retaliation to deprive parents of visitation and records access rights, to cut off parent's access to their child, to manufacture further false allegations of parental unfitness against the complaining parents, to pursue an outcome of detrimental finding or termination of parent rights.

143.    At the time of the underlying events, the County's customs and practices included, but were not limited to:

> a) Not providing parents with information regarding their child's current living and health conditions.
>
> b) Not requiring a social worker to perform regular updates regarding a child's living conditions.
>
> c) Not requiring diligent and competent monitor, visit, interview, and checkup a child in foster placement.
>
> d) Allowing social workers to forgo regular complete, thorough, and accurate reporting and continuing to evaluate the appropriateness of placement.
>
> e) Concealing from state courts and parents abuse, neglect, and molestations of foster children. (See In re B.D. above);
>
> f) Retaliating against parents who complained and reported abuses, neglect, and molestations of their children in the foster care system by engaging in a campaign of sabotaging their reunification services and cutting off communications;
>
> g) Not having sufficient staffing of social workers to deal with the heavy caseloads causing them to make mistakes or to cut corners.

144.    Throughout the years, the County has suffered scandals concerning children being abused and neglected.

145.    The Contra Costa Grand Jury made a finding that it was unable to confirm that DCFS has a clearly defined set of procedures for investigating and resolving complaints and for evaluating and implementing recommendations for improvements in its policies and procedures. In 2019, the Contra Costa Grand Jury also reported that "CFS management interprets the ombudsman's role as not to investigate, but only to bring complaints to the attention of CFS staff. A proposed new ombudsman contract issued to prospective applicants for the position in 2018 describes the CFS ombudsman's main purpose as "to promote and maintain good working

relationships between all parties." The contract, which was still being revised at the time this investigation concluded, places limits on the amount of time the ombudsman is allowed to spend on specific tasks and restricts their investigative role to "complaints as referred by the CFS director."

146.     In the same report, the Grand Jury found consistent staffing issues with the hiring and retention of social workers, with salaries lower than other counties causing work overload. This overload causes high staff turnover and a pileup of work causing social workers to cut corners (e.g., not doing the monthly inspection or lack of diligence in inspection and conversations with children in foster home, etc.).

147.     Given persistent and numerous cases of abuses and neglect or even death of children in foster care years over years, these findings by the Grand Jury provide evidence of the reckless disregard by Contra Costa County for the safety and health of children placed in their foster care system.

148.     As a result of these policies, practices, customs of inadequate training on supervising and inspection of foster home even after numerous incidents of neglect and abuse of foster children, DCFS social workers failed to recognize dangerous conditions of children in foster care.

149.     As a result of these policies, practices, and customs, Plaintiff suffered damages as described above. Plaintiff seeks to recover all available damages for this claim.

## VI.     DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## VII.     PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for a judgment against Defendants, and each of them, as to all causes of action as follows:

1.   General and special damages according to proof;

2.   Punitive damages against the individual defendants as allowed by law;

3.   For attorneys' fees and costs as authorized by law; and

4.   For such further relief as the Court deems just and proper.

Dated: September 20, 2024                    Respectfully Submitted:

                                             /s/ *Steven N. Williams*
                                             Steven N. Williams (State Bar No. 175489)
                                             Kai'Ree K. Howard (State Bar No. 351730)
                                             **STEVEN WILLIAMS LAW, P.C.**
                                             201 Spear Street, Suite 1100
                                             San Francisco, CA 94105
                                             Tel: 415-697-1509
                                             Fax : 415-230-5310
                                             Email: swilliams@stevenwilliamslaw.com
                                             Email: khoward@stevenwilliamslaw.com

                                             *Attorneys for Plaintiff IHM, A Minor through*
                                             *her next of Friend, Bill Sorensen*